**Julie DOMMER, Individually and on behalf of all others similarly situated, Plaintiffs-Appellees,**

v.

**Jack F. CRAWFORD, Prosecuting Attorney for the 31st Judicial Circuit for the State of Indiana, Defendant-Appellant.**

**No. 80–1364.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 26, 1980.

Decided Dec. 31, 1980.

Fred L. Mock, Lake County Pros. Atty., Crown Point, Ind., for defendant-appellant.

Myrna Hart, Project Justice & Equality, Valparaiso Univ. School of Law, Valparaiso, Ind., for plaintiffs-appellees.

Before PELL, Circuit Judge, SKELTON, Senior Judge,* and WOOD, Circuit Judge.

SKELTON, Senior Judge.

Plaintiff Julie Dommer was arrested on a warrant by an officer of the Gary, Indiana, police department and incarcerated in the Gary city jail. The record does not show why she was arrested nor how long she remained in jail. After she was placed in jail, she filed this suit individually and as a class action on behalf of all others similarly situated on the 21st day of November, 1972. She named as defendants, individually and as officers, the mayor, chief of police, members of the Board of Health, the city judge, members of the Board of Public Works, members of the City Council, the warden of the jail, all of whom were officials of Gary, Indiana, and the members of the Indiana State Board of Health who were later dismissed from the case.

In her original complaint the plaintiff's only alleged grievance was that the food served to the inmates in the jail was so bad that it was cruel and unusual punishment under the Constitution to require it to be eaten by her and the other jail prisoners. She asked for a declaratory judgment and injunctive relief under 42 U.S.C. 1983.

The plaintiff filed a second amended complaint on the 25th day of March, 1974, in which she included a second count to the effect that the conditions in the jail were unhealthy and unsanitary and that this was cruel and unusual punishment imposed on the jail prisoners by defendants. She asked for declaratory judgment and injunctive relief regarding these alleged conditions.

The plaintiff also added a third count in which she alleged that an unlawful practice had been engaged in by the Gary, Indiana, police department and Gary police officers in arresting individuals on suspicion and holding them in jail for investigation longer than 24 hours without taking them before a magistrate for a determination of whether the police had probable cause to hold them,

all contrary to the state laws of Indiana. The plaintiffs asked for a declaratory judgment and injunctive relief as to this third count. The plaintiffs also asked for damages. This damage claim was later abandoned. In this amended complaint, the plaintiff included four additional plaintiffs, namely, Carl Kalbrunner, Claude McGuire, Ronald Fields and Dwayne Amos (later dismissed on his motion). She also named the following officials as additional defendants: the cook of the Gary city jail, the acting Health Commissioner of Gary, the Gary Building Commissioner, the Gary Commissioner of the Police Civil Service Commission, members of the Gary Police Civil Service Commission, the Gary Board of Public Safety, the City of Gary, unknown Gary police officers X, Y, and Z, and the Chief Judge of the Criminal Division of the Lake County Superior Court.

By admission of facts, it was proven that dozens of people were arrested by the Gary police and held by them in jail longer than 24 hours without a hearing before a magistrate to determine probable cause for their detention, contrary to the laws of Indiana.

The plaintiffs moved for a partial summary judgment on the third count of their petition, which was granted by the court in an order of July 25, 1975, which was supplemented by the court's order of March 7, 1977. *See Dommer v. Hatcher,* 427 F.Supp. 1040 (N.D.Ind.1977). The court granted all the relief requested by the plaintiffs and in his orders, he tracked, re-enacted, re-codified, and interpreted the laws of the State of Indiana, which all parties, as well as the court, agree, as fully discussed below, cover the complaint of the plaintiffs now before the court. It is clear that had these Indiana laws been invoked in the state courts of Indiana they would have afforded the plaintiffs adequate, complete and sufficient relief for their grievance now before us in this case, namely, their complaint that the police of Gary were arresting people without a warrant and holding them in the city

---

* The Honorable Byron G. Skelton, Senior Judge of the United States Court of Claims, sitting by designation.

jail more than 24 hours without a hearing to determine whether probable cause existed to detain them, all contrary to the laws of Indiana.

The plaintiffs agree in their brief herein that Indiana laws are adequate in providing that a person arrested by the police must be taken before a magistrate by the police within 24 hours for a determination of probable cause for the issuance of a warrant for his arrest and that without such a determination and the issuance of a warrant the detention becomes unlawful. In this regard, the brief of plaintiffs states:

"The district court in the instant case had no cause to delay its decision to await legislative action, for the Indiana legislature had already spoken:

... Whenever an information is filed and the defendant has already been arrested or otherwise brought within the custody of the court, the court shall proceed to determine whether probable cause existed for the arrest of the defendant unless the issue of probable cause has previously been determined by a court issuing a warrant for the defendant's arrest or by a court holding a preliminary hearing after the defendant's arrest.

I.C. 35–3.1–1–1(d), Ind.Stat. § 9–903(d) (1971).

Whenever any arrest has been made by any member of such police force, it shall be the duty of the officer making the arrest forthwith to bring the person arrested before the city court, or court having jurisdiction of the offense, to be dealt with according to law. If the arrest is made during the hours when such court is not in session, or if the judge is not holding court, such offender shall be detained in the city prison until there shall be an opportunity for such hearing at the earliest practicable time, or until he shall have given bond for his appearance. But no person shall be so detained longer than twenty-four [24] hours without such examination, except where Sunday intervenes, in which case no person shall be detained longer than forty-eight [48] hours ...

I.C. 18–1–11–8, Ind.Stat. § 48–6112 (1905). The defendant prosecutor unquestionably finds this statute relevant, admitting in his February, 1975 Motion to Dismiss that:

... the law guarantees that an independent magistrate review the basis for detaining anyone for longer than a 24-hour period; Ind.Ann.Stat. 48–6112 (Burns 1974 Supp.) Absent such a determination and the issuance of a warrant detention of a citizen becomes unlawful. *Id. at page 3.*"

By quoting the foregoing Indiana statutes along with comments relating to the adequacy of such state laws to cover the present complaint of plaintiffs, they admit that they have a plain, adequate and complete remedy for their grievance under Indiana laws. Furthermore, the plaintiffs affirmatively state that the courts of Indiana enforce these laws, saying in their brief:

"The Indiana courts had also prescribed that a prompt finding of probable cause by a neutral magistrate was required for detention. *Williams v. State*, 348 N.E.2d 623 [Ind.] (1976); *Montes v. State*, 332 N.E.2d 786 [Ind.] (1975); *State ex rel. French v. Hendricks Superior Court*, 247 N.E.2d 519 [Ind.] (1969); *Kinnaird v. State*, 242 N.E.2d 500 [Ind.] (1968); *Nacoff v. State*, 267 N.E.2d 165 [Ind.] (1971), where it was held that an arrestee should be taken promptly before a magistrate, pursuant to I.C. 18–1–11–8 (within twenty-four hours), to

... (1) Advise the arrestee of the charges against him; (2) Advise the arrestee of his constitutional rights; (3) Provide arrestee with an attorney if arrestee was without funds to hire one; (4) Determine whether there is sufficient evidence that the crime charged has been committed and that the accused committed it...

*Id.* at 168. Indiana law is thus quite clear on the subject of probable cause determinations..."

Notwithstanding these admissions by the plaintiffs that they had a plain, adequate and complete remedy under the laws of Indiana, which laws are enforced by the courts of that state, they did not file a single lawsuit in the Indiana state courts for a redress of their grievances.

The district judge recognized in his decision herein that the laws of Indiana required the arresting officer to take an arrested person before a magistrate within 24 hours for a determination of probable cause for his arrest and detention or release and that the courts of Indiana enforce these laws in cases filed in the state courts. In this regard he stated:

"Indiana laws allow its police to make warrantless arrests, but its statutes and judicial interpretations make clear that the arrest must be reviewed by a magistrate for probable cause. If the magistrate finds probable cause for arrest, a lawful arrest warrant may issue, if the magistrate does not find probable cause, the defendant is to be released. This was the holding of the Indiana Supreme Court in *State ex rel. French v. Hendricks Superior Court*, 252 Ind. 213, 247 N.E.2d 519 (1969). See also *Kinnaird v. State*, 251 Ind. 506, 242 N.E.2d 500, 506 (1968). ("A judicial determination is a requirement that goes to the heart of the Fourth Amendment.")

"In addition to the case law cited above, Indiana statutes also require the police to bring persons arrested without a warrant before a magistrate and submit evidence to justify the issuance of an arrest warrant. The Indiana Supreme Court in *Nacoff v. State*, 256 Ind. 199, 267 N.E.2d 165 (1971), held that the arrestee should have been taken promptly before the magistrate:

Appellant was held absolutely incommunicado for the four and a half days prior to his giving the statement. Appellant was not taken promptly before a magistrate as required by law. I.C.

1971, 35–1–7–1; 35–1–8–1; 35–1–1–1; 9–1–1–130; 18–1–11–8; 18–4–12–16; being Burns §§ 9–701, 9–704; 9–704a, 47–2307; 48–6112; 48–9416; *Pearman v. State* (1954), 233 Ind. 111, 117 N.C.2d 362.

*Id.* at 168.

"The court then outlined what Indiana law requires at the initial appearance before a magistrate:

The purpose of this hearing before a magistrate is threefold: (1) Advise the arrestee of the charges against him; (2) Advise the arrestee of his constitutional rights; (3) Provide arrestee with an attorney if arrestee was without funds to hire one; (4) Determine whether there is sufficient evidence that the crime charged has been committed and that the accused committed it . . .

*Id.* at 168."

The district judge proceeded on July 25, 1975, to enter a declaratory judgment and mandatory injunction on plaintiffs' count III[1] in which he stated:

"The defendant's practice of arresting individuals on 'suspicion' or 'for investigation' and holding them for periods in excess of twenty-four (24) hours without an initial appearance before a magistrate deprives the plaintiffs of rights guaranteed by the Fourth Amendment of the United States Constitution, Article 1, § 11 of the Indiana Constitution, and Indiana Statutes: I.C. 1971, 35–1–7–1; 35–1–8–1; 35–31–1–1(d); 35–4–1–1; 9–4–1–130; 18–1–11–8; 18–4–12–16; being Burns §§ 9–701, 9–704; 9–704a; 9–903(d); 47–2307; 48–6112; 48–9416."

The district court then issued the following mandatory injunction as a part of his decision:

"Defendants, their successors in office, agents and employees are ordered, within thirty (30) days:

A) To implement the following procedures for assuring that the plaintiffs

---

1. A stipulated consent decree agreed to by the plaintiffs and the City of Gary defendants was entered in favor of the plaintiffs on plaintiffs' Counts I and II (the food and jail conditions counts), and, therefore, only Count III is before us on this appeal.

and the class they represent will be afforded an initial appearance before a magistrate within twenty-four (24) hours of arrest where the detainee must be informed of his constitutional rights and a probable cause determination made by the magistrate.

1. *Initial Appearance Before a Magistrate.* An officer making an arrest under a warrant or an arrest without a warrant shall (pursuant to Indiana's Constitution and Statutes, and the United States Constitution) take the arrested person without unnecessary delay before a judicial magistrate. If the arrest is made during the hours the court is not in session, the arrestee shall be admitted to bail at the police station or detained until there shall be an opportunity for such hearing at the earliest practicable time, or until he shall have given bond for his appearance. But no person shall be detained longer than twenty-four (24) hours without such examination, except where Sunday intervenes, in which case no person shall be detained longer than forty-eight (48) hours.

2. *Probable Cause Determination by the Magistrate.* Upon the arrestee's initial appearance the magistrate shall inform him of the charge and provide him with a written copy thereof. The magistrate must further determine whether there is sufficient evidence that the crime charged has been committed and that the accused committed it. If from the evidence the magistrate determines that there is probable cause for the arrest, he shall either admit the arrestee to bail or commit him to custody; otherwise, the magistrate shall release him.

B) Submit a monthly report to the plaintiffs' counsel listing the names of all detainees in the Gary City Jail, the time and date of their incarceration, and the time and date of their initial appearance before a magistrate for the next calendar year."

The declaratory judgment and injunction of the court was amended by his order of March 7, 1977, with reference to certain details not material here, except he added the following:

"Defendants, their successors in office, agents and employees are ordered to:

\* \* \* \* \* \*

'Submit a monthly report to this court listing the names and addresses of all detainees, the times and dates of their incarceration, the time and dates of their initial appearance before a judicial official, and the times and dates of the release from custody of these detainees for the next calendar year.' "

It is clear from the declaratory judgment and mandatory injunction of the district court that he injected himself into the administration of the state criminal laws of Indiana and actually took over the management and administration of such laws insofar as they applied to the police and the police department of the city of Gary, Indiana, including the monitoring of the jail register, when, by the admission of all parties and by the district judge himself, the laws of Indiana and their enforcement by the courts of that state were adequate to afford the plaintiffs all the relief to which they were entitled. Yet the plaintiffs never resorted to the Indiana state courts and never gave those courts an opportunity to consider, much less decide, their alleged grievances. They wholly failed to exhaust their state remedies. We conclude that this action by the district judge was an impermissible interference by him with the administration of the criminal laws of Indiana by the courts and officials of that state. Such interference is not the function of a federal court except in very unusual and exceptional circumstances not present here where the state laws do not afford protection of the constitutional rights of citizens.[2]

2. This case appears to be for the most part a training project for the law students of the Valparaiso University School of Law. The pleadings, motions, briefs, etc. were variously signed by attorneys for a group called "Project Justice and Equality" of such law school, and

The Supreme Court has held many times that the courts and public officials of a state are entitled to enforce and administer state laws without interference by the federal courts. The landmark case in this area is *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) in which the court stated:

"Since the beginning of this country's history Congress has, subject to few exceptions, manifested a desire to *permit state courts to try state cases free from interference by federal courts.*"

\* \* \* \* \* \*

"The precise reasons for this longstanding *public policy against federal courts interference with state court proceedings* have never been specifically identified but the primary sources of the policy are plain. One is the basic doctrine of equity jurisprudence that *courts of equity should not act*, and particularly should not act to restrain a criminal prosecution, *when the moving party has an adequate remedy at law* and will not suffer irreparable injury if denied equitable relief.

\* \* \* \* \* \*

"This underlying reason for restraining courts of equity from interfering with criminal prosecutions is reinforced by an even more vital consideration, the notion of 'comity', that is, a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that *the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways.* This, perhaps for lack of a better and clearer way to describe it, is referred to by many as 'Our Federalism,' and one familiar with the profound debates that ushered our Federal Constitution into existence is bound to respect those who remain loyal to the ideals and dreams of 'Our Federalism.' The concept does not mean blind deference to 'States' Rights' any more than it means centralization of control over every important issue in our National Government and its courts. The Framers rejected both these courses. What the concept does represent is a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the *National Government*, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so *in ways that will not unduly interfere with the legitimate activities of the States.* It should never be forgotten that this slogan, 'Our Federalism,' born in the early struggling days of our Union of States, occupies a highly important place in our Nation's history and its future."

\* \* \* \* \* \*

"Ordinarily, *there should be no interference with such [state] officers; primarily, they are charged with the duty of prosecuting offenders against the laws of the State and must decide when and how this is to be done. The accused should first set up and rely upon his defense in the state courts,* even though this involves a challenge of the validity of some statute, unless it plainly appears that this course would not afford adequate protection." 401 U.S. at 43–45, 91 S.Ct. at 750–751 (Emphasis supplied).

The above principles have come to be known as the *Younger* principles and they have been followed in many cases. *See*

by Indiana Civil Liberties Union, Calumet Chapter, by a clinical professor of the law school, and by legal interns, legal research assistants of the law school, and legal aid clinic, various attorneys of the law school, and a group of law students. The case has been long and protracted, extending from 1972 to the present date. Representatives of the plaintiffs have made innumerable demands and contentions and have filed many pleadings, motions,

demands for admissions, depositions, etc., compiling a transcript of 3 large volumes without any oral testimony. These groups representing the plaintiffs would have been well advised to file a suit or suits for the plaintiffs in the state courts where an adequate and complete remedy was available under the laws of Indiana as enforced by the courts of that state instead of resorting to the federal courts.

*Trainor v. Hernandez*, 431 U.S. 434, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977); *Juidice v. Vail*, 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977); and *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975).

In *Huffman*, the Supreme Court held that the *Younger* principles were applicable to civil cases as well as criminal proceedings such as those involved in *Younger.* The court said:

> "The seriousness of federal judicial interference with state civil functions has long been recognized by this Court. We have consistently required that when federal courts are confronted with requests for such relief, they should abide by standards of restraint that go well beyond those of private equity jurisprudence. For example, *Massachusetts State Grange v. Benton*, 272 U.S. 525, 47 S.Ct. 189, 71 L.Ed. 387 (1926), involved an effort to enjoin the operation of a state daylight savings act. Writing for the Court, Mr. Justice Holmes cited *Fenner v. Boykin*, supra, and emphasized a rule that 'should be very strictly observed,' 272 U.S., at 529, 47 S.Ct. at 190, 71 L.Ed. 387, '*that no injunction ought to issue against officers of a state clothed with authority to enforce the law in question, unless in a case reasonably free from doubt and when necessary to prevent great and irreparable injury.*' Id., at 527, 47 S.Ct. at 190, 71 L.Ed. 387.
>
> "Although Mr. Justice Holmes was confronted with a bill seeking an injunction against state executive officers, rather than against state judicial proceedings, we think that the relevant considerations of federalism are of no less weight in the latter setting. If anything, they counsel more heavily toward federal restraint, since interference with a state judicial proceeding prevents the state not only from effectuating its substantive policies, but also from continuing to perform the separate function of providing a forum competent to vindicate any constitutional objections interposed against those policies. Such interference also results in duplicative legal proceedings, and can

readily be interpreted 'as reflecting negatively upon the state court's ability to enforce constitutional principles.' Cf. *Steffel v. Thompson*, supra, 415 at 462, 94 S.Ct. at 1217, 39 L.Ed.2d 505.

> "The component of *Younger* which rests upon the threat to our federal system is thus applicable to a civil proceeding such as this quite as much as it is to a criminal proceeding." 420 U.S. 603–604, 95 S.Ct. 1208 (Emphasis supplied).

In that case the court pointed out that the fact that a case involves constitutional issues does not automatically entitle the litigant to have the issues decided in a federal court because such issues can be decided in a state court as well. The Court said in this regard:

> "Appellee's argument, that because there may be no civil counterpart to federal habeas it should have contemporaneous access to a federal forum for its federal claim, apparently depends on the unarticulated major premise that every litigant who asserts a federal claim is entitled to have it decided on the merits by a federal, rather than a state, court. We need not consider the validity of this premise in order to reject the result which appellee seeks. Even assuming, arguendo that litigants are entitled to a federal forum for the resolution of all federal issues, that entitlement is most appropriately asserted by a state litigant when he seeks to *relitigate* a federal issue adversely determined in *completed* state court proceedings. We do not understand why the federal forum must be available prior to completion of the state proceedings in which the federal issue arises, and the considerations canvassed in *Younger* militate against such a result." 420 U.S. 606, 95 S.Ct. 1209 (Emphasis in original).

\*　　\*　　\*　　\*　　\*　　\*

Continuing, the court in that case held that a federal court should not substitute itself for a state court even if federal issues were involved, and that a litigant should first exhaust his state appellate remedies before resorting to the federal courts. The court said:

"In short, we do not believe that a State's judicial system would be fairly accorded the opportunity to resolve federal issues arising in its courts if a federal district court were permitted to substitute itself for the State's appellate courts. We therefore hold that *Younger* standards must be met to justify federal intervention in a state judicial proceeding as to which a losing litigant has not exhausted his state appellate remedies. 420 U.S. 609, 95 S.Ct. 1211.

\*     \*     \*     \*     \*     \*

"For regardless of when the Court of Common Pleas' judgment became final, we believe that a necessary concomitant of *Younger* is that a party in appellee's posture must exhaust his state appellate remedies before seeking relief in the District Court unless he can bring himself within one of the exceptions specified in *Younger*." 420 U.S. 608, 95 S.Ct. 1210.

In *Trainor,* the Supreme Court again adopted and emphasized the principles of *Younger,* saying:

"Beyond the accepted rule that equity will ordinarily not enjoin the prosecution of a crime, however, the Court voiced a 'more vital consideration,' 401 U.S., at 44, 91 S.Ct. 746, 27 L.Ed.2d 669, namely *that in a union where both the States and the Federal Government are sovereign entities, there are basic concerns of federalism which counsel against interference by federal courts, through injunctions or otherwise, with legitimate state functions, particularly with the operation of state courts.* Relying on cases that declared that *courts of equity should give 'scrupulous regard [to] the rightful independence of state governments,' Beal v. Missouri Pacific R. Co.,* 312 U.S. 45, 50, 61 S.Ct. 418, 421, 85 L.Ed. 577 (1941), the Court held that, in this intergovernmental context, the two classic preconditions for the exercise of equity jurisdiction assumed new dimensions. Although the existence of an adequate remedy at law barring equitable relief normally would be determined by inquiring into the remedies available in the federal rather than in the state courts, *Great Lakes Co. v. Huffman,* 319 U.S. 293, 297, 63 S.Ct. 1070, 1072, 87 L.Ed. 1407 (1943), here the inquiry was to be broadened to *focus on the* remedies available in the pending state proceeding. " '*The accused should first set up and rely upon his defense in the state courts,* even though this involves a challenge of the validity of some statute, unless it plainly appears that this course would not afford adequate protection.' " *Younger v. Harris,* 401 U.S. at 45, 91 S.Ct. at 751, 27 L.Ed.2d 669, quoting *Fenner v. Boykin,* 271 U.S. 240, 243–244, 46 S.Ct. 492, 493, 70 L.Ed. 927 (1926)." 431 U.S. 441, 97 S.Ct. 1916 (Emphasis supplied).

\*     \*     \*     \*     \*     \*

The court then went on to say that state courts have a solemn responsibility equally with federal courts to safeguard the constitutional rights of litigants and that federal courts should not prevent them from doing so. The court held:

" \* \* \* to restrain a state proceeding that afforded an adequate vehicle for vindicating the federal plaintiff's constitutional rights 'would entail an unseemly failure to give effect to the principle that state courts have the solemn responsibility equally with the federal courts' to safeguard constitutional rights and would 'reflec[t] negatively upon the state court's ability' to do so. *Steffel v. Thompson,* 415 U.S. 452, 460–461, 462, 94 S.Ct. 1209, 1216, 1217, 39 L.Ed.2d 505 (1974). The State would be prevented not only from 'effectuating its substantive policies, but also from continuing to perform the separate function of providing a forum competent to vindicate any constitutional objections interposed against those policies.' *Huffman v. Pursue, Ltd.,* 420 U.S., at 604, 95 S.Ct. at 1208, 43 L.Ed.2d 482." 431 U.S. 443, 97 S.Ct. 1917.

The court then commented on the *Huffman* and *Juidice* cases as follows:

"*Huffman* involved the propriety of a federal injunction against the execution of a judgment entered in a pending state-court suit brought by the State to enforce

a nuisance statute. Although the state suit was a civil rather than a criminal proceeding, *Younger* principles were held to require dismissal of the federal suit. Noting that the State was a party to the nuisance proceeding and that the nuisance statute was 'in aid of and closely related to criminal statutes,' the Court concluded that a federal injunction would be 'an offense to the State's interest in the nuisance litigation [which] is likely to be every bit as great as it would be were this a criminal proceeding.' 420 U.S., at 604, 95 S.Ct. at 1208, 43 L.Ed.2d 482. Thus, while the traditional maxim that equity will not enjoin a criminal prosecution strictly speaking did not apply to the nuisance proceeding in *Huffman*, the "'more vital consideration'" of comity, id., 420 U.S. at 601, 95 S.Ct. at 1208, 43 L.Ed.2d 482, quoting *Younger v. Harris*, supra, [401 U.S.] at 44, 91 S.Ct. at 750, 27 L.Ed.2d 669, counseled restraint as strongly in the context of the pending state civil enforcement action as in the context of a pending criminal proceeding. In these circumstances, it was proper that the federal court stay its hand.

"*We have recently applied the analysis of Huffman to proceedings similar to state civil enforcement actions—judicial contempt proceedings. Juidice v. Vail,* 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977). The Court again stressed the 'more vital consideration' of comity underlying the *Younger* doctrine and held that *the state interest in vindicating the regular operation of its judicial system through the contempt process—whether that process was labeled civil, criminal, or quasi-criminal—was sufficiently important to preclude federal injunctive relief unless Younger standards were met.*" 431 U.S. 443–444, 97 S.Ct. 1918.

In the cited *Juidice* case, the Court again approved the non-interference principles of *Younger,* holding:

"We must decide whether, with the existence of an available forum for raising constitutional issues in a state judicial proceeding, the United States District Court could properly entertain appellees'

§ 1983 action in light of our decisions in *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and *Huffman v. Pursue, Ltd.,* 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975). We hold that it could not." 430 U.S. 330, 97 S.Ct. 1215.

\*   \*   \*   \*   \*   \*

"We now hold, however, that the principles of *Younger* and *Huffman* are not confined solely to the types of state actions which were sought to be enjoined in those cases. As we emphasized in *Huffman,* the ' "more vital consideration" ' behind the *Younger* doctrine of nonintervention lay not in the fact that the state criminal process was involved but rather in ' "the notion of 'comity,' that is, a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that *the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways.*" ' *Huffman,* 420 U.S., at 601, 95 S.Ct. at 1206, 43 L.Ed.2d 482, quoting *Younger,* 401 U.S. at 44, 91 S.Ct. 750, 27 L.Ed.2d 669." 430 U.S. 335, 97 S.Ct. 1217. (Emphasis supplied).

A significant decision of the Supreme Court in this area is found in its opinion in *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). In that case a federal district court entered an order requiring the Philadelphia City Police Commissioner to put in force a directive governing the manner by which citizens' complaints against police officers should thereafter be handled by the police department. The decision was affirmed by the court of appeals. The Supreme Court held that the order of the district court was an unauthorized intrusion by the court into the official functions of the police committed to them by state and local law. The Court said:

"We granted certiorari to consider petitioners' claims that the judgment of the District Court represents an unwarranted

intrusion by the federal judiciary into the discretionary authority committed to them by state and local law to perform their official functions. We find ourselves substantially in agreement with these claims, and we therefore reverse the judgment of the Court of Appeals." 423 U.S. 366, 96 S.Ct. 602.

In that case the court held further:

"When a plaintiff seeks to enjoin the activity of a government agency, even within a unitary court system his case must contend with the 'well-established rule that the Government has traditionally been granted the widest latitude in the "dispatch of its own internal affairs," *Cafeteria Workers v. McElroy*, 367 U.S. 886, 896, 81 S.Ct. 1743, 1749, 6 L.Ed.2d 1230 (1961),' quoted in *Sampson v. Murray*, 415 U.S. 61, 83, 94 S.Ct. 937, 950, 39 L.Ed.2d 166 (1974). The District Court's injunctive order here, significantly revising the internal procedures of the Philadelphia police department, was indisputably a sharp limitation on the department's 'latitude in the "dispatch of its own internal affairs." '

"When the frame of reference moves from a unitary court system, governed by the principles just stated, to a system of federal courts representing the Nation, subsisting side by side with 50 state judicial, legislative, and executive branches, appropriate consideration must be given to principles of federalism in determining the availability and scope of equitable relief. *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 928, 95 S.Ct. 2561, 2566, 45 L.Ed.2d 648 (1975). 423 U.S. 378–379, 96 S.Ct. 607–608.

"*Thus the principles of federalism* which play such an important part in governing the relationship between federal courts and state governments, though initially expounded and perhaps entitled to their greatest weight in cases *where it was sought to enjoin a criminal prosecution in progress, have not been limited either to that situation or indeed to a criminal proceeding itself. We think these principles likewise have applicability where injunctive relief is sought, not against the judicial branch of the state government, but against those in charge of an executive branch of an agency of state or local governments such as respondents here.* Indeed, in the recent case of *Mayor v. Educational Equality League*, 415 U.S. 605, 94 S.Ct. 1323, 39 L.Ed.2d 630 (1974), in which private individuals sought injunctive relief against the Mayor of Philadelphia, we expressly noted the existence of such considerations, saying: '[T]here are also delicate issues of federal-state relationships underlying this case.' Id., at 615, 94 S.Ct. at 1331, 39 L.Ed.2d 630.

"Contrary to the District Court's flat pronouncement that a federal court's legal power to 'supervise the functioning of the police department . . . is firmly established,' it is the foregoing cases and principles that must govern consideration of the type of injunctive relief granted here. *When it injected itself by injunctive decree into the internal disciplinary affairs of this state agency, the District Court departed from these precepts.*

"For the foregoing reasons the judgment of the Court [423 U.S. 381, 96 S.Ct. 609] of Appeals which affirmed the decree of the District Court is reversed." 423 U.S. 380–381, 96 S.Ct. 609. (Emphasis supplied).

The *Rizzo* case was followed by the Third Circuit Court of Appeals in *Lewis v. Hyland*, 554 F.2d 93 (1977), in which that court held:

"The Supreme Court, however, has recently given expression to the doctrine of federal equitable abstention as it relates to federal court intervention in local police operations. In light of *Rizzo v. Goode, supra*, in which the Supreme Court reversed this Court's approval of an injunction against widespread police abuses in Philadelphia, we conclude that the record of law enforcement abuses as it appears in this case—dismaying as it is—will not support federal injunctive relief." 545 F.2d at 95.

The *Rizzo* case is much like the case before us, because the declaratory judgment and the mandatory injunction of the court in the instant case is directed solely against the defendant prosecuting attorney of Lake County, Indiana, as far as this appeal is concerned, since he is the only defendant who has appealed, and, consequently, is the only appellant before us, we can therefore decide the validity of the district court's orders only insofar as they apply to him as an official of the state and local governments of Indiana. Like in *Rizzo*, the prosecuting attorney in the instant case is an official of an executive branch of the state and local governments of the State of Indiana just as the police in *Rizzo* were officials of an executive branch of the state and local governments of Pennsylvania. The district court in our case had no more authority to inject itself into the internal affairs of the prosecuting attorney than the district court had in *Rizzo* when it interfered with the internal affairs of the police department of Philadelphia. The *Rizzo* case is directly in point on the problem before us.

The plaintiffs rely on the case of *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 and say that it is controlling in the instant case. We do not agree. The case is neither controlling here nor even apposite. The facts in that case are so different to those in our case that it is clearly distinguishable. We will proceed to show why this is so.

*Gerstein* was a Florida case. The facts in that case show that the plaintiffs and those they represent were arrested *on informations* filed by the prosecuting attorney and confined to jail for long periods of time without any kind of hearing to determine probable cause. The laws of Florida did not provide for such a hearing before a magistrate or other judicial officer. The theory of the law was that the prosecuting attorney *himself* determined probable cause for plaintiffs' arrests before he filed the informations. The plaintiffs filed a class action against Dade County officials, including the prosecuting attorney, in federal court asking for a judicial hearing on probable cause

and a declaratory judgment and injunctive relief. The court delayed action while the Florida Legislature considered a bill that would have afforded preliminary hearings for persons arrested on informations. When the bill failed to pass, the court granted the requested relief. Indications were that had the bill passed the court would have abstained. When the case reached the Supreme Court it struck down the Florida system of allowing the prosecutor to determine probable cause without a hearing before a magistrate. The court said:

"Under the Florida procedures challenged here, a person arrested without a warrant and charged by information may be jailed or subjected to other restraints pending trial without any opportunity for a probable cause determination. Petitioner defends this practice on the ground that the prosecutor's decision to file an information is itself a determination of probable cause that furnishes sufficient reason to detain a defendant pending trial. Although a conscientious decision that the evidence warrants prosecution affords a measure of protection against unfounded detention, we do not think prosecutorial judgment standing alone meets the requirements of the Fourth Amendment. Indeed, we think the Court's previous decisions compel disapproval of the Florida procedure. In *Albrecht v. United States*, 273 U.S. 1, 5, 47 S.Ct. 250, 251, 71 L.Ed. 505 (1927), the Court held that an arrest warrant issued solely upon a United States Attorney's information was invalid because the accompanying affidavits were defective. Although the Court's opinion did not explicitly state that the prosecutor's official oath could not furnish probable cause, that conclusion was implicit in the judgment that the arrest was illegal under the Fourth Amendment. More recently, in *Coolidge v. New Hampshire*, 403 U.S. 443, 449–453, 91 S.Ct. 2022, 2029–2031, 29 L.Ed.2d 564 (1971), the Court held that a prosecutor's responsibility to law enforcement is inconsistent with the constitu-

tional role of a neutral and detached magistrate. We reaffirmed that principle in *Shadwick v. City of Tampa,* 407 U.S. 345, 92 S.Ct. 2199, 32 L.Ed.2d 783 (1972), and held that probable cause for the issuance of an arrest warrant must be determined by someone independent of police and prosecution. See also *United States v. United States District Court,* 407 U.S. 297, 317, 92 S.Ct. 2125, 2136, 32 L.Ed.2d 752 (1972)." 420 U.S. 116–118, 95 S.Ct. 864–865.

\* \* \* \* \* \*

The decision in that case was not an intrusion by the court into the internal affairs of the judiciary nor of the official functions of the prosecuting attorney, but was based on the fact that Florida *laws* did not provide for a judicial hearing for arrested persons on probable cause. This is shown by the following language in the majority and concurring opinions:

"Whatever procedure a State may adopt, it must provide a fair and reliable determination of probable cause as a condition for any significant pretrial restraint of liberty, and this determination must be made by a judicial officer either before or promptly after arrest." 420 U.S. 124–125, 95 S.Ct. 868–869.

\* \* \* \* \* \*

"It is the prerogative of each State in the first instance to develop pretrial procedures that provide defendants in pretrial custody with the fair and reliable determination of probable cause for detention required by the Constitution. Cf. *Morrissey v. Brewer,* 408 U.S. 471, 488, 92 S.Ct. 2593, 2603, 33 L.Ed.2d 484. The constitutionality of any particular method for determining probable cause can be properly decided only by evaluating a State's pretrial procedures as a whole, not by isolating a particular part of its total system. As the Court recognizes, great diversity exists among the procedures employed by the States in this aspect of their criminal justice systems. Ante, at 123–124, 91 S.Ct. 868, 43 L.Ed.2d at 71." 420 U.S. 127, 95 S.Ct. 870.

The court emphasized the defect in the Florida laws by the following statement in the concurring opinion of four of the justices:

" \* \* \* the Constitution clearly requires at least a timely judicial determination of probable cause as a prerequisite to pretrial detention. *Because Florida does not provide all defendants in custody pending trial with a fair and reliable determination of probable cause for their detention,* the respondents and the members of the class they represent are entitled to declaratory and injunctive relief." 420 U.S. at 126, 95 S.Ct. at 869, 43 L.Ed.2d 72. (Emphasis supplied).

Thus, it is clear that the declaratory judgment and injunction were issued and approved in *Gerstein* because of a defect in the Florida laws. By contrast, the laws of Indiana in the *instant* case are complete and adequate and would have afforded the plaintiffs all the relief to which they were entitled had they filed suit in the state courts. Therefore, the *Gerstein* case is not relevant to our decision in this case.

We conclude that the orders of the district court in the form of a declaratory judgment and mandatory injunction in the case before us were an unauthorized interference with the administration of the laws of Indiana by the courts of that state and by the prosecuting attorney of Lake County. Accordingly, the orders are invalid and cannot stand. This is especially true with respect to the prosecuting attorney in connection with his performance of the duties committed to him by the laws of the state and local governments.[3]

■ The declaratory judgment issued by the district court against defendant, Jack F. Crawford, the present prosecuting attorney

---

3. At the risk of unduly lengthening this opinion, we have quoted extensively from the decisions of the Supreme Court in *Younger v. Harris, supra,* and its progeny, and *Rizzo v. Goode, supra,* because the plaintiffs have challenged the relevancy of these cases to the instant action. It is our view that the language and wording we have quoted from the opinions in these cases show that the challenge of the plaintiffs is unfounded.

of Lake County, is unauthorized and invalid for the further reason that the plaintiffs have failed to allege or prove that they have a live ongoing case against him as required by Article III of the Constitution and by the Declaratory Judgment Act, 28 U.S.C., § 2201. In order to place this issue in proper perspective, we deem it necessary to show how and when Crawford became a defendant in this case, as well as the allegations and proof, if any, by the plaintiffs against him.

When the plaintiffs filed their original complaint on November 21, 1972, the prosecuting attorney of Lake County was not named as a defendant. Neither was he made a defendant in plaintiffs' second amended complaint filed on March 25, 1974. In fact, he was not made a party defendant until November 8, 1974, almost two years after the original complaint was filed. This was accomplished in a rather strange proceeding. The defendant, Hatcher, mayor of defendant City of Gary, filed a motion on the 9th of October, 1974, to make Henry Kowalczyk, the prosecuting attorney of Lake County, and Raymond Sufana, his chief deputy, defendants in the case "in order that the *plaintiffs* may receive complete relief" in the action. Defendant Hatcher did not ask for relief against such officials either for himself or the City of Gary. He did not ask that they be made third party defendants. The court granted the motion on October 9, 1974, and ordered the plaintiffs to further amend their complaint to include such parties as defendants. Pursuant to the order of the court, the plaintiffs accordingly amended their complaint on the 8th day of November, 1974, to include Henry Kowalczyk, the prosecuting attorney of Lake County, and also the chief deputy prosecutor of Lake County, Raymond Sufana, as defendants only in their official capacities. Their successors in office were not made defendants.

It is clear that the plaintiffs did not voluntarily on their own motion make these officers defendants, but impleaded them only because they were required to do so by the order of the court. The plaintiffs made them defendants by adding the following paragraph to their second amended complaint:

"1a. After the arrest of one suspected of committing a crime, the police officers are responsible for preparing the case for presentation to the Lake County Prosecuting Attorney who makes the final decision on whether or not to file a charge in a court in Lake County with criminal jurisdiction. Thus there are two possible delays in bringing an accused into court: a) a delay caused by the police in processing the case for presentation to the prosecuting attorney, and b) a delay caused by the prosecuting attorney in the preparation, service and filing of the charge in court. Defendant city officials contend they cannot remedy the delay caused by the defendant prosecuting attorney and his staff."

This is the first allegation in plaintiffs' complaint that relates to or even mentions the prosecuting attorney of Lake County. It is clear that this paragraph is entirely speculative, hypothetical, and theoretical in that it speaks only of a "possible" delay caused by such attorney in the preparation, service and *filing of a charge* in court against an arrested person. The plaintiffs did not accuse the prosecuting attorney of any wrongdoing, nor assert any claim or ask for any relief against him or his successors in office. The plaintiffs simply did not allege a cause of action against the prosecuting attorney. In short, they failed to show a live case between them and such attorney. This is especially true in view of the fact that Kowalczyk ceased to be the prosecuting attorney on January 8, 1975, and was dismissed from the case by the court on that date. Thereafter defendant prosecuting attorney Sufana ceased to occupy that office and was also dismissed from the case by the court on February 7, 1980, and at the same time the court on his own motion substituted Jack F. Crawford, prosecutor of Lake County, as a party defendant. The only way we know that Crawford was made a defendant was by a twelve-word notation to that effect on the court's docket sheet that is in the record. There is no

showing on the docket sheet that any process was ever issued or served on Crawford, nor that the plaintiffs ever amended their complaint to make him a defendant or to allege any wrongdoing by him or to make any claim against him. The only time he was even mentioned in the case was when the court *sua sponte* made him a defendant only 6 days before he entered his final judgment in the case. Crawford is the only defendant who has appealed.

The foregoing facts show that there was no live case or actual controversy between the plaintiffs and Crawford. Consequently, as shown by the authorities cited below, the district court erred in issuing the declaratory judgment against him.[4]

It is well established that a federal court has no power to issue a declaratory judgment in a case unless it involves an actual live controversy between adverse parties in an adversary proceeding. In fact, the Declaratory Judgment Act, 28 U.S.C., § 2201, expressly provides:

> "*In a case of actual controversy* within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. (Emphasis added)."

This principle has been enunciated by the Supreme Court in many cases. In *Golden v. Zwickler*, 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969), the court held:

"[T]he federal courts established pursuant to Article III of the Constitution do not render advisory opinions. For adjudication of constitutional issues, 'concrete legal issues, presented in actual cases, not abstractions,' are requisite. This is as true of declaratory judgments as any other field. *United Public Workers of America v. Mitchell*, 330 U.S. 75, 89, 67 S.Ct. 556, 564, 91 L.Ed. 754, 766 (1947). The difference between an abstract question and a 'controversy' contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy. Basically, the question in each case is whether the facts alleged, under all the circumstances, show there is a substantial controversy between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 511, 85 L.Ed. 826, 828 (1941)." 22 L.Ed.2d at 117 and 118.

\*   \*   \*   \*   \*   \*

"The express limitation of the Declaratory Judgment Act to cases 'of actual controversy' is explicit recognition of this principle." Ibid. 394 U.S. at p. 110, 89 S.Ct. at p. 960, 394 U.S. at 108, 89 S.Ct. at 959–960, at p. 119.

---

4. There is a question whether Julie Dommer and the other named plaintiffs have standing to maintain this suit either for themselves or as representatives of the class they purport to represent. Such named plaintiffs have not alleged nor proven that they themselves were arrested without a warrant and held in jail without being brought before a magistrate by the arresting officer for a hearing on probable cause within 24 hours which is their grievance in Count III of their amended complaint. The record shows that Dommer was arrested on a warrant where probable cause had previously been determined. McGuire was serving time in jail in payment of a fine of $87.00 imposed on him by a previous conviction for driving an unregistered car without a license. Amos was dismissed as a plaintiff. Kalbrunner had been convicted in city court. There is no showing one way or the other as to plaintiff Fields. The case was litigated for 8 years in the district court (1972–1980). The named plaintiffs were released from jail long ago, and, as far as the record shows, they had no ongoing grievance or complaint against the defendants at the time the district court entered the final judgment in the case on February 13, 1980. This is especially true as to defendant-appellant Crawford who had been a defendant in the case for only 6 days during which period of time the plaintiffs did not file any pleadings or offer any proof against him. See *Juidice v. Vail, supra*, and *Rizzo v. Goode, supra*. The appellant did not raise the standing issue on this appeal, and, in any event, we find it unnecessary to decide the question in view of our disposition of the case on other grounds.

**1046**

In *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 61 S.Ct. 510, 85 L.Ed. 826 (1941), the Supreme Court also said:

"The question is whether petitioner's allegations are sufficient to entitle it to the declaratory relief prayed in its complaint. This raises the question whether there is an 'actual controversy' within the meaning of the Declaratory Judgment Act (Judicial Code § 274d, 28 U.S.C.A. § 400), *since the District Court is without power to grant declaratory relief unless such a controversy exists. Nashville, C. & St. L.R. Co. v. Wallace*, 288 U.S. 249, 259, 53 S.Ct. 345, 346, 77 L.Ed. 730, 773, 87 A.L.R. 1191; U.S.C.A. Constitution, Art. 3 § 2. 312 U.S. at 273, 61 S.Ct. at 512, 85 L.Ed. at 828 (Emphasis supplied)."

These authorities make it clear that there must be an actual controversy between the parties before the court has the authority to issue a declaratory judgment. Furthermore, the controversy must be extant at the time the judgment is entered and also at all stages of review. This was the holding of the Supreme Court in *Steffel v. Thompson*, 415 U.S. 452, 94 S.Ct. 1209, 29 L.Ed.2d 505 (1974), where the court said:

"Nonetheless, there remains a question as to the *continuing* existence of a live and acute controversy that must be resolved on the remand we order today.[10]"

[10.] The rule in federal cases is that *an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed.* See, e. g., *Roe v. Wade*, 410 U.S., at 125, 93 S.Ct. at 713, 35 L.Ed.2d 147; *SEC v. Medical Comm. for Human Rights*, 404 U.S. 403, 92 S.Ct. 577, 30 L.Ed.2d 560 (1972); *United States v. Munsingwear, Inc.*, 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36 (1950)." 415 U.S. 459, 94 S.Ct. 1216 (Emphasis supplied).

(Emphasis in original).

In *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the Supreme Court held:

"The usual rule in federal cases is that an actual controversy must exist at stages of appellate or certiorari review, and not simply at the date the action is initiated. *United States v. Munsingwear, Inc.*, 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36 (1950); *Golden v. Zwickler*, supra; *SEC v. Medical Committee for Human Rights*, 404 U.S. 403, 92 S.Ct. 577, 30 L.Ed.2d 560 (1972)." 410 U.S. 125, 93 S.Ct. 712–713.

We conclude that there was no live case or actual controversy between the plaintiffs and appellant Crawford at the time the judgment was entered and none exists at the present time. Therefore, the declaratory judgment was unauthorized.

As shown above, the district court also issued an injunction against Crawford which in effect ordered him to obey the laws of Indiana in the future (which he was required to do anyway), and not to commit an illegal act by holding persons arrested without a warrant in the Gary city jail longer than 24 hours without taking them before a magistrate for a determination of probable cause for their arrest on a warrant. Aside from the invalidity of the injunction as a matter of law, as shown below, it was also invalid under the situation and circumstances of this case. The facts show that Crawford was the county prosecutor and was not an arresting officer. He had no control or supervision whatever over the Gary police or the Gary Police Department or the Gary city jail and had no authority as a prosecutor to arrest anyone. He had no knowledge that the police had arrested anyone and placed him in jail unless and until the arresting officer brought the person before a magistrate for a hearing. Also, the laws of Indiana quoted above plainly and specifically imposed on the arresting officer the duty of producing an arrested person before a magistrate for a hearing, which in this case was a policeman and not the county prosecutor Crawford. The plaintiffs never alleged nor proved, nor could they do so, that Crawford *himself* ever arrested and incarcerated any person in the Gary city jail, much less held him in jail more than 24 hours without a hearing before a magistrate. It will be remembered that the third count of plaintiffs' petition was directed against the illegal acts of the police of Gary, and the relief they sought was against them and not against the prosecuting attorney. The

facts further show that the prosecuting attorney did not *prefer charges* against an arrested person until *after* that person had been brought before a magistrate for a hearing on probable cause by the arresting officer, and not even then unless the magistrate found probable cause for his detention and issued a warrant for his arrest. The plaintiffs did not complain of this practice by the prosecuting attorney in either their original or second amended complaint. This was no doubt due to the fact that such procedure was in accordance with the laws of Indiana. Under these facts the issuance of the injunction against Crawford was unauthorized and improper.

■ The injunction was invalid as to Crawford as a matter of law for the further reason that it was an exercise of the equity powers of the court to enjoin the future commission of a crime, i. e. incarcerating a prisoner longer than 24 hours without a hearing, contrary to Indiana law. This is not authorized except in exceptional circumstances not present in this case. It is especially true here where the plaintiffs had an adequate remedy at law in the state courts of Indiana which they did not pursue.

In the early case of *In re Debs*, 158 U.S. 564, 15 S.Ct. 900, 39 L.Ed. 1097 (1895), the Supreme Court held:

> "Again, it is objected that it is outside of the jurisdiction of a court of equity to enjoin the commission of crimes. This, as a general proposition, is unquestioned. A chancellor has no criminal jurisdiction. Something more than the threatened commission of an offense against the laws of the land is necessary to call into exercise the injunctive powers of the court. There must be some interferences, actual or threatened, with property or rights of a pecuniary nature, ____." 158 U.S. at 593, 15 S.Ct. at 909, 39 L.Ed. at 1105.

This court set forth the general rule and listed certain exceptions to it in the case of *United States v. Jalas*, 409 F.2d 358 (1969), as follows:

> "Underlying our examination of the injunctive-relief issued is the doctrine that courts have no power to enjoin the commission of a crime. See 5 J. Moore, Federal Practice ¶ 38.24[3], at 192 (2d ed. 1968). Historically this doctrine has been subject to exception in only three general situations: national emergencies, widespread public nuisances, and where a specific statutory grant of power exists. All the cases cited by the Government fall into one or another of these categories. For example *In re Debs*, 158 U.S. 564, 15 S.Ct. 900, 39 L.Ed. 1092 (1895), *United States v. United Mine Workers of America*, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947), and *United States v. Brotherhood of R.R. Trainmen*, 96 F.Supp. 428 (N.D.Ill. 1951), dealt with court-issued injunctions where acute national emergency situations which were unique necessitated such relief. The case of *Hecht Co. v. Bowles*, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754 (1944), which the Government relies upon, concerned the use of an injunction which was expressly granted by statute. The Government does not cite any cases falling under the public nuisance rubric, but examples are set forth by the Supreme Court in the *Debs* case. It is our view that the facts of the instant case do not fall into any of the categories of exceptions to the general rule prohibiting issuance of an injunction against the commission of a crime."

> \* \* \* \* \* \*

> "There is no national emergency which warrants departing from the general rule prohibiting injunctions against the commission of criminal acts." 409 F.2d at 360.

*See also United States v. Kentland-Elkhorn Coal Corp.*, 353 F.Supp. 451, 454 (E.D. Ky.1973); *Bass Anglers Sportman's Society of America v. Scholze Tannery, Inc.*, 329 F.Supp. 339, 346 (E.D.Tenn.1971); *Bass Angler Sportsman Society v. United States Steel Corp.*, 324 F.Supp. 412, 416 (N.D.Ala.), *aff'd sub nom., Bass Anglers Sportsman Society of America, Inc. v. Koppers Co.*, 447 F.2d 1304 (5th Cir. 1971).

Accordingly, we hold that the declaratory judgment and injunction issued by the district court were unauthorized and invalid.

The judgment of the district court is reversed and the cause is remanded with instructions to dismiss the third count in plaintiffs' amended complaint.

REVERSED AND REMANDED with instructions.

HARLINGTON WOOD, Jr., Circuit Judge, with whom PELL, Circuit Judge, joins, concurring.

I can understand Judge Sharp's concern about the situation he confronted where Indiana law enforcement officials clearly appeared to be deliberately violating their own Indiana statutes. But whether he was right or wrong in his corrective actions, I would hope that there would not be a need even for the state courts of Indiana to remind Indiana law enforcement officers that they must abide by their own Indiana statutes, much less for anyone else to have to come back on a later day to again seek Judge Sharp's constitutional assistance. If that most unlikely need ever occurs again, I would keep the door of the federal courthouse open to a constitutional re-examination of the situation. Perhaps this case in addition to providing some training for law students at Valparaiso University as mentioned in footnote 2, something generally I would not want to discourage, may also have served to focus state attention on a situation which should be voluntarily corrected back home in Indiana, not here in federal court.